**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NICOLETTA PANTELYAT, MICHAEL EDWARDS, and ISABELLE SCHERER, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> BANK OF AMERICA, N.A. and BANK OF AMERICA CORPORATION, <br><br> Defendants | Civil Action No. 1:16-cv-08964-AJN |

## DECLARATION OF TINA WOLFSON

I, Tina Wolfson, declare as follows:

1.      I am a partner and founding member of Ahdoot & Wolfson, PC ("AW"), and a member in good standing of the bars of the State of New York, the State of California, and the District of Columbia. I am Class Counsel in this Action. I respectfully submit this declaration in support of Plaintiffs' Motion for Award of Service Payments to Class Representatives, Award of Attorneys' Fees, and Reimbursement of Expenses. I have personal knowledge of the facts set forth in this declaration and could and will testify competently to them if called upon to do so.

2.      The Settlement Agreement and Release in this matter was filed on January 19, 2018 (Dkt. 65-1). The Court issued its preliminary approval of the Settlement on March 19, 2018 (Dkt. 71, Preliminary Approval Order).

## CLASS COUNSEL'S LITIGATION AND SETTLEMENT EFFORTS

3.    AW commenced its investigation of this case in April of 2016, approximately seven months before the initial complaint was filed. This thorough pre-filing investigation and evaluation included:

a.    Interviews with hundreds of Bank of America deposit account holders and inspection and analyses of numerous individual bank statements involving a multitude of different overdraft fees for a multitude of "recurring" and "non-recurring" charges;

b.    Researching changes in Bank of America's business practices that became effective *circa* 2010;

c.    Researching and documenting comments and public statements made by Bank of America concerning those changes in business practices in 2010, and the effect such changes would have on consumers;

d.    Reviewing historical social media postings by consumers, and historical archives of consumer complaints made publicly available by the OCC and CFPB, in order to determine the scope and prevalence of the alleged misclassifications at issue in this Action, as identified by Class Counsel;

e.    Researching and analyzing FOIA archives containing correspondence sent by Bank of America executives to government agencies and departments, including to the OCC and other financial regulators, concerning the distinction between "recurring" and "non-recurring" debit card transactions that such entities had proposed for implementation in the lead up to the enactment of Regulation E;

f.    Analyzing CFPB enforcement proceedings against Defendants to gauge their relevance to the allegations of this case. *See, e.g.*, Consent Order, In the Matter of Bank of America, N.A.; and FIA Card Services, N.A., Case No. 2014-CFPB-0004 (US CFPB Apr. 2014) (Dkt. 1);

g.    Discovering and performing an in-depth analysis of the various and numerous iterations of the Bank of America Deposit Agreement, and Bank of America, N.A.

Merchant Services Agreement (and the myriad terms and conditions therein), as well as various other contractual documents in effect since 2010;

        h.     Discovery and analysis of Bank of America's lengthy Merchant Services Agreement and various iterations thereto, including review of publicly-available merchant services agreements between merchants and financial institutions other than Bank of America, and other contractual and card-related documents and policies concerning merchant charge classifications and credit and debit card transaction descriptors;

        i.     Researching and analyzing the way in which Bank of America's core processing system is able to classify, and reclassify, debit card transactions in real-time;

        j.     Discovery, analysis, and inspection of the Uber website and application across various operating systems (and through various application updates);

        k.     Monitoring representations made by Uber through its Application, its website, and in the media. This effort included reviews of historical versions of the Uber website (specifically the FAQ pages), and analyzing certain statements made by Uber at various times regarding the provenance of the "recurring" classifier on a billing descriptor corresponding to an Uber debit card transaction on a bank statement;

        l.     Discovering, reviewing, and analyzing the APIs pertaining to payment used by Uber, as well as other publicly-accessible documents and computer code pertaining to the ways in which clients of such payment processors, including Uber, process debit card transactions (an API is an application program interface that dictates how software and other computer components interact);

        m.     Analysis of various other smart phone applications across various operating systems;

        n.     Consulting with various experts regarding the debit card payment systems and networks;

        o.     Conducting a thorough examination, investigation and evaluation of the relevant law and facts to assess the merits of the claims, causes of action, and available

3

defenses, including a survey of applicable laws of all U.S. states;

       p.      Determining whether forced arbitration (*e.g.*, through Uber's various rider contracts in effect during the relevant period and the enforceability of different iterations of this agreement, promulgated through difference devices and operating systems) would be a factor in this case; and

       q.      Investigating and analyzing other actions against, and/or settlements entered into, by Bank of America that could possibly be related to the allegations of this Action. *See, e.g.*, *Bodnar v. Bank of America*, Case No. 5:14-cv-03224-EGS (E.D. Penn), Dkt. 52 (Class Action Complaint), Dkt. 73-2 (Jan. 13, 2016) (settlement agreement and release in a matter involving overdrafts charged by Bank of America on certain debit card transactions; http://www.bankofamericaoverdraftsettlement.com/en (last visited May 31, 2018)). This process was ongoing and continued throughout the litigation, as AW continued to monitor and analyze other matters that could affect the rights of the putative Class in this Action. *See, e.g.*, *Farrell v. Bank of America*, Case No. 3:16-cv-00492-L-WVG (S.D. Cal.) Dkt. 69-2 (Oct. 31, 2017) (settlement agreement and release in a matter involving "extended" overdraft charges imposed by Bank of America on deposit accounts).

       4.      Following the pre-filing investigation stage, on behalf of Plaintiff Pantelyat and the putative Class, AW prepared and filed the comprehensive Class Action Complaint (Dkt. 1), which outlines Defendants' contractual promises made in the deposit agreement and other contractual account documents, the ways in which those promises changed over the years, and the ways in which Plaintiff Pantelyat alleges Defendants breached those contractual promises by charging overdraft fees as a result of Uber debit card transactions. In preparing the Complaint, AW conducted exhaustive legal research concerning potentially applicable causes of action and available defenses, and a survey of potentially applicable laws across the United States, as well as choice of law issues.

       5.      Following the filing of the Complaint in this Action, Plaintiffs drafted and served a lengthy Demand for Preservation of Documents and Information, prepared wide-

ranging requests for production of documents and interrogatories to Defendants (concerning every aspect of the issues relevant to both the merits of claims alleged in the Action and class certification).

6.      AW drafted and negotiated a Protective Order and ESI Protocol with defense counsel. The Protective Order was entered on the docket. (Dkt. 38.)

7.      In response to the Motion to Dismiss, Plaintiffs drafted a brief in opposition (after performing additional legal research and analysis concerning every aspect of the issues presented in Defendants' motion to dismiss), which addressed and rebutted each of the myriad of novel arguments raised by Defendants.

8.      While these litigation efforts were underway, and following the filing of the Motion to Dismiss, the Parties commenced discussions regarding the possibility of resolving the matter. Class Counsel was thus simultaneously working to secure the excellent Settlement preliminarily approved by the Court.

9.      After months of discussions and pre-negotiations (during which Class Counsel conducted discovery calculated to obtain relevant facts and documents, reviewed voluminous data, information and documents produced by Bank of America and consulted with experts), the Parties agreed to attend mediation with the Honorable Daniel Weinstein (Ret.) of JAMS. Judge Weinstein is a highly respected and experienced class action mediator, who joined JAMS following many years on the bench, and has mediated hundreds of class actions.

10.     The Parties participated in three separate mediations on June 20, 2017, August 3, 2017, and on October 13, 2017, when the Parties reached an agreement in principal.

11.     Judge Weinstein was assisted in all the mediations conducted in this matter by another JAMS mediator, Lizbeth Hasse, Esq. Following the mediation sessions, the Parties worked further with Judge Weinstein and Ms. Hasse in order to reach an agreement.

12.     In preparation for the mediation, AW prepared a lengthy and comprehensive mediation statement (which included a number of exhibits) outlining Plaintiffs' position on liability and analyzing damages. AW also reviewed Defendants' mediation brief in preparation

for mediation.

13.     Before entering into the Settlement, AW conducted a thorough examination, investigation, and evaluation of the relevant law, facts, and allegations to assess the merits of the claims and potential claims to determine the strength of liability, potential remedies, and all defenses thereto.

14.     AW consulted with experts regarding the process by which a given transaction is classified as recurring or non-recurring, served discovery and obtained and reviewed voluminous data, documents and information from Bank of America, travelled to North Carolina (the headquarters of Bank of America) and interviewed Bank of America employees, conducted its own independent research and evaluation regarding the facts relevant to this case, and conducted further legal research in to the claims and defenses proffered by Bank of America.

15.     Bank of America's verified statements show the following: during the period of January 1, 2012 to December 31, 2016: (i) 245,200 accounts were charged one or more $35 Uber Overdraft Fees that were not refunded; (ii) Bank of America charged 774,984 separate Uber Overdraft Fees that were not refunded; (iii) Bank of America charged a total of $27,124,440 in such overdraft fees; (iv) Bank of America charged a total of $30,285,430 in Uber Overdraft Fees and that $3,160,990 of this amount was refunded; and (v) Bank of America charged 865,298 Uber Overdraft Fees of $35 apiece, and refunded 90,314 of such these fees into 26,742 accounts.

16.     AW obtained a list of individuals holding the aforementioned 245,200 accounts and the number of Uber Overdraft Fees charged to each account (the Settlement Class Member List). The list included the mailing address for each individual identified. The mailing addresses listed included all fifty states in the United States.[1]

---

[1]     I am informed by the Settlement Administrator, Epiq Systems, Inc., and believe that following the Preliminary Approval of the Settlement, analysis of data set of the 245,200 accounts revealed the following: (i) six (6) of the 245,200 accounts were not charged an overdraft fee as a result of an Uber transaction, and thus were not Settlement Class Members; (ii)

17.     Before and during all settlement discussions and mediations, the Parties exchanged sufficient information to permit Plaintiffs and AW to evaluate the claims and potential defenses and to meaningfully conduct informed settlement discussions.

18.     Subsequent to the mediations, the Parties engaged in extensive additional arms-length negotiations, through many telephone discussions and a number of in-person meetings, to finalize and memorialize all aspects of the Settlement Agreement, including each of its exhibits.

19.     Thereafter, Class Counsel arranged for a competitive bidding process for three nationally recognized and experienced Settlement Administration companies to submit bids to administer the Settlement.

20.     After the competitive bidding process, during which Plaintiffs obtained and analyzed three (3) separate bids and discussed their contents with each administrator, the Parties agreed to engage Epiq to provide advice regarding the mechanics of the Settlement and the notice process, and to administer the Settlement. Through a number of discussions and negotiations, Class Counsel were able to secure Epiq's agreement to a maximum service fee for any and all of the work and expenses in this Action.

21.     The Settlement and its exhibits, the notice program, and each document comprising the notice were negotiated separately through many in-person and telephonic meetings, were meticulously drafted by Class Counsel, and were subject to exhaustive negotiations, multiple rounds of revisions and phone calls, and were repeatedly refined. In addition, Epiq provided input on all notice documents to ensure that they were comprehensive and easy to read and understand, and complied with the due process requirements of the law.

22.     After finalizing the Settlement Agreement, AW prepared the Motion for Preliminary Approval, which was filed on January 19, 2018. (Dkts. 63 – 65.) The Settlement

---

1,010 of the 245,200 entries on the data contained duplicate names and addresses and that such individuals held two (2) separate accounts at Bank of America; and (iii) consequently Epiq mailed the Notice (attached as **Exhibit A** to this Declaration) to 244,184 addresses.

was also filed the same day. (Dkt. 65-1.) In support of Preliminary Approval, AW drafted and filed comprehensive declarations and a lengthy 50-State Summary of Class Claims in Support of Conditional Nationwide Certification Pursuant To Settlement, which demonstrated that Plaintiffs' nationwide class claims against Bank of America for breach of contract do not vary materially from state to state.

23.     Concurrently with the Settlement Agreement and Preliminary Approval Motion, AW prepared and filed a proposed Amended Class Action Complaint, which included Plaintiffs Michael Edwards and Isabelle Scherer. Class Counsel's Co-Plaintiffs' Counsel, the law firms of Whitfield, Bryson & Mason, LLP ("WBM") and Zimmerman Reed, LLP ("ZR"), also appeared in this Action at this time. Rather than filing separate similar class actions against Bank of America in separate jurisdictions (where Mr. Edwards and Ms. Scherer opened their accounts, in Illinois and New Jersey, respectively), these firms cooperated with Class Counsel in the Action and this Settlement to ensure an organized and efficient effort on behalf of the putative Class. Both WBM and ZR are experienced class action litigation firms, both reviewed the terms of the Settlement and agreed that the Settlement was in the best interests of the class and more than fair, reasonable and adequate. WBM also participated in the discovery process and analysis of documents.

24.     Thus, the Parties agreed to the terms of the Settlement through experienced counsel who possessed all the information necessary to evaluate the case, determined all the contours of the proposed class, and reached a fair and reasonable compromise after negotiating the terms of the Settlement at arm's length with the assistance of a neutral mediator.

25.     The proposed Settlement was thus reached as a result of extensive arm's length negotiations between the Parties. As detailed above, AW conducted discovery, investigated the facts and underlying events relating to the subject matter of the claims, and analyzed the applicable legal principles.

26.     Since the Court granted preliminary approval, my firm has worked with the Settlement Administrator, Epiq Systems, Inc., to carry out the Court-ordered notice plan. This

work included a final review of the Notice, timely negotiation of an escrow agreement for the Settlement Fund, review and edit of the script for the IVR messaging system servicing the Settlement's toll-free number, and reviewing and testing of the settlement website before it launched live.

27.     Since class notice was disseminated, AW has worked with Epiq on a weekly basis to monitor settlement claims and any other issues that may arise. AW also has responded to all Class Member inquiries it received and has fielded many calls from Settlement Class Members regarding questions about the Settlement. This process is ongoing. Class Counsel will continue to devote time and labor after the Settlement is finally approved, including  overseeing the administration of the Settlement on behalf of the Settlement Class, responding to inquiries and answering questions from Settlement Class Members, working with the Settlement Administrator to resolve any concerns that may arise, among other tasks.

## RESPONSE OF THE CLASS, INTEREST ACCRUED, AND ADMINISTRATION COSTS TO DATE

28.     As part of our work overseeing the administration of the Settlement, my firm is in regular contact with the Settlement Administrator, Epiq Systems, Inc. Epiq reports that it established the Settlement Website prior to mailing the Notice (which AW verified), mailed the Notice to all Settlement Class Members by April 23, 2018, and received 68 requests for exclusion and no objections (the opt-out and objection deadline is June 22, 2018). Epiq also reports that, as of May 31, 2018, the Settlement Fund has accrued interest in the amount of $37,953.22. Epiq will provide a separate declaration concerning implementation of the Notice Plan and all data relevant to the administration by July 6, 2018 – the deadline set by the Court in the Preliminary Approval Order (and after the opt out and objection deadlines).

## AW'S ATTORNEYS' FEES & EXPENSES

29.     Robert Ahdoot and I were the primary attorneys handling this case. Together we supervised a team of attorneys and staff from AW in performing the work necessary to

successfully litigate and negotiate the class settlement herein. We also coordinated litigation and settlement strategy with attorneys working for AW and with attorneys from co-Plaintiffs' Counsel Zimmerman Reed, LLP ("ZR") and Whitfield, Bryson Mason, LLP ("WBM"). AW expended a substantial amount of time and resources on this matter to the exclusion of other work.

30.     Robert Ahdoot oversaw and directed the work of all Counsel with respect to all aspects of the litigation of this Action to ensure efficiency, lack of duplication, and to limit the lodestar to the extent possible.

31.     AW has sought to reach — and has reached — consensus with ZR and WBM from the inception of their involvement in the Action, to manage the administration, organization, and work division in this case in a systematic and efficient manner.  AW coordinated work assignments to avoid duplication of efforts or unnecessary work undertaken by any of the counsel appearing in this action.

### AW'S EXPERIENCE

32.     The AW attorneys working with me on this matter were my partners Robert Ahdoot and Theodore Maya, and AW associates Vanessa Shakib, Bradley K. King, and Meredith Lierz.

33.     I attended and graduated Harvard Law School *cum laude* in 1994. I began my civil litigation career at the Los Angeles office of Morrison & Foerster, LLP, where I defended major corporations in complex civil actions and represented indigent individuals in immigration and deportation trials as part of the firm's *pro bono* practice. I then gained further invaluable litigation and trial experience at a boutique firm, focusing on representing plaintiffs on a contingency basis in civil rights and employee rights cases. I frequently lecture on numerous topics related to class action litigation across the country, as detailed in the Firm Resume attached here to as **Exhibit B**.

34.     Robert Ahdoot attended and graduated Pepperdine Law School *cum laude* in 1994, where he served as Literary Editor of the Pepperdine Law Review. He also clerked for

the Honorable Paul Flynn at the California Court of Appeals, and began his career as a civil litigator at the Los Angeles office of the New York firm, Mendes & Mount, LLP, where he defended large corporations and syndicates such as Lloyds of London in complex environmental and construction-related litigation as well as a variety of other matters. Robert Ahdoot has also lectured on numerous topics related to class action litigation across the country, as detailed in the Firm Resume.

35.     Founded in 1998, and headquartered in Los Angeles, California, AW is a nation-wide law firm specializing in complex and class action litigation and public interest litigation. For decades, the attorneys at AW have vigorously litigated against large corporations and public entities vindicating the rights of millions of consumers, employees, and taxpayers in protracted, complex litigation, to successful results. AW has represented plaintiffs in employment, consumer rights, civil rights, environmental and taxpayer rights litigation. AW partners have been named "Super Lawyers" by their peers in recognition of the results achieved by their work. Since its founding, AW has served as class counsel and in leadership positions in a wide range of consumer protection class actions.

36.     Theodore W. Maya is a partner at AW who worked on this matter as detailed below. Mr. Maya graduated from UCLA Law School in 2002 after serving as Editor-in-Chief of the *UCLA Law Review*. From July 2003 to August 2004, Mr. Maya served as Law Clerk to the Honorable Gary Allen Feess in the United States District Court for the Central District of California. Mr. Maya also worked as a litigation associate in the Los Angeles offices of Kaye Scholer LLP for approximately eight years, where he worked on a large variety of complex commercial litigation from inception through trial. Mr. Maya was named "Advocate of the Year" for 2007 by the Consumer Law Project of Public Counsel for successful *pro bono* representation of a victim of a large-scale equity fraud ring.

37.     Bradley K. King is an associate at AW who worked on this matter as detailed below. Mr. King is a member of the Bars of the States of New York and California and in good standing in both jurisdictions. He graduated from Pepperdine University School of Law in

2010, where he served as Associate Editor of the Pepperdine Law Review. He worked as a law clerk for the California Office of the Attorney General, Correctional Law Section in Los Angeles and was a certified law clerk for the Ventura County District Attorney's Office. Mr. King began his legal career at a boutique civil rights law firm, gaining litigation experience in a wide variety of practice areas, including employment law, police misconduct, municipal contract, criminal defense, and premises liability cases.

38.     Vanessa T. Shakib is also an associate at AW who worked on this matter as detailed below.  Ms. Shakib graduated from George Mason University Law School in 2012, where she served as Senior Notes Editor of the *Journal of International Commercial Law* and a member of the Moot Court Board.  Ms. Shakib began her legal career at Wasserman, Comden, Casselman & Esensten, LLP, where she practiced general business litigation and public entity liability. Ms. Shakib has also extensive experience in the field of animal rights litigation and advocacy.

39.     Meredith S. Lierz was an associate at AW who worked on this matter as detailed below.  Ms. Lierz graduated from Southwestern University School of Law in 2013. Ms. Lierz also obtained a Master's in Business Administration from Claremont Graduate University. While at Southwestern University School of Law, Ms. Lierz was a Lead Articles Editor at *Southwestern Law Review* and a member of the Southwestern Law School Moot Court Honors Program.  Ms. Lierz left her employment at Ahdoot & Wolfson, PC in April 2017 when she moved from Los Angeles.

40.     Diana Kiem is a paralegal at AW who worked on this matter as detailed below. Ms. Kiem graduated from Pasadena Community College (located in Pasadena, California), in 2016, with a degree in Paralegal studies.

41.     Since 1999, Robert Ahdoot and I have been appointed to leadership positions in numerous complex consumer class actions. The following are some examples of recent (2016-2018) class actions that AW has litigated to conclusion or are currently litigating on behalf of its clients — either as Class Counsel, proposed Class Counsel or members of a Court appointed

Plaintiff Steering Committee (additional matters are listed in AW's firm resume):

- *Eck, et al. v. City of Los Angeles*, No. BC577028 (Los Angeles Superior Court ("LASC")): AW, along with co-Class Counsel, achieved a class settlement valued at a minimum of $243 million ($52 million cash fund and $191 million in audited tax savings over 3 fiscal years after settlement (value of tax savings following these fiscal years is to be determined)) based on alleged violations of California's Propositions 26 and 218.

- *Lavinsky vs. City of Los Angeles,* No. BC542245 (LASC): AW, along with co-Class Counsel, achieved a class settlement valued at a minimum of $50 million (approximate $31 million cash fund and $18.56 million in verified tax savings over 3 fiscal years after settlement (value of tax savings following these fiscal years is to be determined)), class settlement based on allegedly unlawful city tax on natural gas usage; preliminary approval pending.

- *McKnight v. Uber Techs., Inc.*, No. 3:14-cv-05615-JST (N.D. Cal.) (Hon. Jon S. Tigar) – AW appointed Class Counsel; Final approval pending for a class settlement establishing a non-reversionary fund of $32.5 million returning allegedly hidden "safe ride" fee that Uber unfairly charged its customers.

- *Kirby v. McAfee, Inc.*, No. 14-cv-02475-EJD (N.D. Cal.): appointed by the Hon. Edward J. Davila as co-lead class counsel. Plaintiffs challenged defendant's auto renewal and false discount practices. Settlement made $80 Million available to the class and included injunctive relief requiring McAfee to notify customers at the point of every sale that the service will be auto-renewed at an undiscounted subscription price. Further, the settlement required McAfee to change its policy regarding the past product price it lists as a reference to any discount it's currently offering. McAfee will now only list a past price that it has actually charged customers within the past 45 days.

- *In re: Lumber Liquidators Chinese-Manufactured Flooring Durability Mktg. & Sales Practices Litig.*, No. 1:16-md-02743-AJT-TRJ (E.D. Va.) (Hon. Anthony J. Trenga) – Robert Ahdoot is co-counsel for the plaintiff class claiming alleged misrepresentations

of laminate flooring durability, coordinated with MDL proceedings regarding formaldehyde emissions.  $36 million non-reversionary fund settlement in principle reached along with formaldehyde MDL. Preliminary approval and Robert Ahdoot's Class Counsel application pending.

- *In re: Uber FCRA Litig.*, No. 3:14-cv-05200-EMC (N.D. Cal.) (Hon. Edward M. Chen) – class settlement provides $8.2M in monetary relief as well as injunctive relief guaranteeing Uber's compliance with FCRA background check requirements; settlement reached while district court's denial of a motion to compel individual arbitration was pending (and ultimately overturned) before the 9th Cir; defended by Gibson Dunn.

- *Chimeno-Buzzi v. Hollister Co, et al.,* No. 1:14-cv-23120-MGC (S.D. Fla.): $10 Million class settlement arising from violations of the Telephone Consumer Protection Act of 1991 ("TCPA").

- *Smith v. Floor and Décor Outlets of America, Inc.*, No. 1:15-cv-04316-ELR (N.D. Ga.): $14 million class settlement regarding flooring product defect allegations.

- *In re: Experian Data Breach Litig.*, No. 8:15-cv-01592-AG-DFM (C.D. Cal.): AW is currently serving as appointed co-lead counsel managing a PSC of six firms, after contested application and hearing in consolidated litigation consisting of 38 class actions arising from a data breach disclosing the sensitive financial information of over 15 million T-Mobile customers.  Plaintiffs seek both monetary and injunctive relief. On January 26, 2018, after two-and-a-half years of intense but efficient litigation, and concurrent settlement discussions that began in March 2017 and included three full-day mediations, the parties reached a class-wide settlement in principle.  The parties are not yet at liberty to disclose the terms of the settlement.

- *Remijas v. Neiman Marcus Group, LLC*, No. 1:14-cv-01735 (N.D. Ill.): Theodore Maya and I were responsible for briefing and arguing the groundbreaking appeal from the trial court's order, which had granted the motion to dismiss on the pleadings based on lack of Article III standing.  The Seventh Circuit's landmark opinion was its first to address the Supreme Court's decision in *Clapper v. Amnesty Intern. USA*, 133 S. Ct. 1138 (2013).  This *Neiman*

*Marcus* opinion was the first appellate court to reject this view of *Clapper* and, adopting the plaintiffs' reasoning, established, among other things, that data breach victims have standing to pursue claims based on the increased risk of identity theft and fraud, even before that theft or fraud materializes.  *See Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688 (7th Cir. 2015).  This matter resulted in an $1.6 million class settlement, which that court preliminarily approved.  Final approval is pending.

- *In re: Kind LLC "All Natural" Litig.*, No. 1:15-md-02645-WHP (S.D.N.Y.): AW is currently serving as appointed interim co-lead counsel for the plaintiff class by MDL Court after contested hearing.

- *In re: The Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-md-02583-TWT (N.D. Ga.): AW served, by court appointment, on the MDL Consumer Plaintiffs' Steering Committee.  The finally approved settlement provided approximately $29 million of monetary relief to the consumer class, as well as robust injunctive relief requiring Home Depot to overhaul its data security practices.

- *In re: Premera Blue Cross Customer Data Sec. Breach Litig.*, No. 15-md-02633-SI (D. Or.) (Hon. Michael H. Simon): I currently serve, by court appointment after contested leadership applications, on the Executive Leadership Committee.

- *In re: U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, No. 1:15-mc-01394-ABJ (D.D.C.) (Hon. Amy Berman Jackson): AW is currently serving, by court appointment, on the PSC, comprised of three firms, after contested leadership application and hearing.

- *Gordon v. Chipotle Mexican Grill, Inc.*, No. 1:17-cv-01415-CMA-MLC (D. Colo.) (Hon. Christine M. Arguello): I currently serve as Co-Lead Counsel for the putative consumer class arising from a nationwide restaurant payment card data breach.

- *Adlouni v. UCLA Health Sys. Auxiliary*, No. BC589243 (Cal. Super. Ct. Los Angeles Cty.) (Hon. John Shepard Wiley): AW is currently serving, by court appointment, on the PSC with six other firms.  There is a settlement agreement in principle.

15

- *L.D. v. Torrance Mem'l Med. Ctr.*, No. BC670591 (Cal. Super. Ct. Los Angeles Cty.) (Hon. Carolyn B. Kuhl): I currently serve as Class Counsel in a consolidated class action arising from a data breach of a private hospital's medical records.

## AW'S HOURS AND LODESTAR

42.     AW expended 1,454.1 hours in this litigation through May 30, 2018. I expect that AW will incur significant additional hours to see this case through completion of the settlement, including: finalizing and filing fee motion papers; continuing to supervise class notice and claims with the settlement administrator and defense counsel; responding to class member inquiries or challenges; responding to any requests for exclusion or objections; preparing and filing final approval papers; attending the final approval hearing; working with Defendants and the settlement administrator on the distribution of awards to the Class; monitoring the award distributions to the Class; ensuring that any residual is paid to the Court-approved *cy pres* beneficiary; and reporting to the Court that the distribution of settlement funds has been completed. Robert Ahdoot and I expect to maintain a high level of oversight and involvement in this process; therefore, I anticipate incurring significant additional lodestar in the future.

43.     AW's representation of the Class was on a wholly contingent basis. The firm devoted substantial resources to this matter, and we have received no payment for any of the 1454.1 hours of services performed or the tens of thousands of dollars in out of pocket costs and expenses that AW committed to the litigation of this case.  We did this, with no guarantee of repayment, because of the public interest and social importance of this case. Moreover, AW was required to forego other financial opportunities to litigate this case. AW thus took this case with the expectation that the firm would receive a risk enhancement in the event we prevailed.

44.     All attorneys and legal staff who worked on this case were instructed to maintain and did maintain, contemporaneous time records reflecting the time spent on all billable matters. In all instances, the time keeper indicates the date and amount of time spent on a task to one-tenth of an hour describes the work that was performed during the indicated time period,

and identifies the case to which the time should be charged.

45.     AW made every effort to litigate this matter efficiently by coordinating the work of AW's attorneys and paralegals, and the other law firms involved, minimizing duplication, and assigning tasks in a time and cost-efficient manner, based on the time keepers' experience levels and talents.

46.     I reviewed the records of all time that all AW timekeepers entered and exercised billing judgment by deleting time entries that I deemed to be duplicative, inefficient, vague, administrative, or otherwise non-compensable.

47.     The remaining hours AW billed were properly and necessarily spent on the firm's assigned tasks and projects. The detailed time records for the remaining hours spent by my firm and billed to this case through May 30, 2018 are available to the Court upon request. I certify to the Court that AW's fee records accurately reflect work actually, reasonably, and necessarily performed in connection with the litigation of this matter.  I believe that the hours spent reflect time spent reasonably litigating this case, in which Robert Ahdoot and I have sought to manage and staff efficiently as described above.

48.     A summary of rates and hours expended by AW's professionals, as of May 30, 2018, is set forth as follows:

| Professional | Title | Billable Rate | Billable Hours | Billable Fees |
|---|---|---|---|---|
| Tina Wolfson | Senior Partner | $850 | 125.1 | $    106,335.00 |
| Robert Ahdoot | Senior Partner | $850 | 542.7 | $    461,295.00 |
| Theodore Maya | Partner | $675 | 473.7 | $    319,747.50 |
| Bradley King | Associate | $475 | 113.5 | $     53,912.50 |
| Vanessa Shakib | Associate | $475 | 143.6 | $     68,210.00 |
| Meredith Lierz | Associate | $450 | 29.1 | $13,095.00 |
| Diana Kiem | Paralegal | $125 | 26.4 | $      3,300.00 |
| TOTALS: | | | 1,454.1 | $ 1,025,895.00 |

49.     All AW attorneys who worked on this matter billed a total of 1,454.1 hours (as of May 30, 2018) for a total lodestar of $1,025,895.

50.     I am informed and believe that all WBM attorneys who worked on this matter billed a total of 121.6 hours for a total lodestar of $74,645.

51.     I am informed and believe that all ZR attorneys who worked on this matter billed a total of 37.1 hours for a total lodestar of $24,754.50.

### AW'S REASONABLE HOURLY RATES

52.     I believe that my firm's rates are fully commensurate with the hourly rates of other nationally prominent firms performing similar work for both plaintiffs and defendants. After considering all of these data points, I have determined that the rates are reasonable for each of the AW professionals who worked on this matter.

53.     Because of the importance of recovery of attorney fee awards in contingency cases to a plaintiffs' class action practice firm such as AW, we keep current on federal, and California and New York (among others) state law developments on the subject of attorneys' fees. Accordingly, AW is familiar with the prevailing market rates for leading attorneys in California and New York (where AW maintains offices) for complex and class action litigation.

54.     AW periodically establishes hourly rates for the firm's billing personnel. AW establishes the rates based on prevailing market rates for attorneys and law firms in the Los Angeles and New York areas (where AW maintains offices) that have attorneys and staff of comparable skill, experience, and qualifications. AW obtains information concerning market rates from other attorneys in the area that have similar experience doing similar work, from information that occasionally appears in the local press and national bar publications, to orders awarding attorneys' fees in similar cases. The information obtained by AW demonstrates that its rates are in line with (and slightly below) the non-contingent market rates charged by attorneys of comparable experience, skill, and reputation for similar class action work.

55.     The bulk of AW's practice is contingent, and many of my firm's cases have resulted in substantial settlements or verdicts. In contingent risk cases, my firm and other firms doing this type of work frequently advance tens or hundreds of thousands of dollars in expenses and costs and defer all payment of our fees for several years, with no guarantee that any of the fees we incurred or costs we advanced would ever be recovered.

56.     Courts have recently awarded AW attorneys' fees at rates that are comparable to the rates applicable to this matter. *See, e.g. Eck v. City of Los Angeles*, Case No. BC577028 (Los Angeles Superior Court 2018) ($243 million California Propositions 26 and 218 cases regarding allegedly illegal tax on electricity usage where the Court awarded Class Counsel's full request of approximately $15 million based on percentage of the fund method and the same hourly rates (Court's Order and underlying pleading available upon request); *Williamson, et al. vs. McAfee, Inc.*, Case No. 5:14-cv-00158-EJD (N.D. Cal. Feb. 15, 2017) (Dkt. 118; $85 Million settlement in deceptive auto renewal case); *Smith v. Floor & Decor Outlets of Am., Inc.*, Case No. l:15-cv-04316-ELR, (N.D. Ga. Jan. 10, 2017) (Dkt. No. 69; $14.5 Million product liability settlement re: laminate flooring); *Chimeno-Buzzi v. Hollister Co.*, Case No. 1:14-cv-23120-MGC (S.D. Fla. April 11, 2016) (Dkt. No. 155; $10 Million TCPA Settlement); *West v. ExamSoft Worldwide Inc.*, Case No. 1:14-cv-22950-UU (S.D. Fla. October 9, 2015) (Dkt. No. 62; $2.1 Million Settlement in Bar Exam Testing case).

57.     The rates charged by AW are reasonable and well within the range of rates charged by comparably qualifying attorneys for comparably complex work.  Comparable hourly rates have been found reasonable in numerous cases, including the following recent authority:

a.     *Cotter et al. v. Lyft, Inc.,* N.D. Cal. No. 13-cv-04065-VC, Order Granting Final Approval of Settlement Agreement, filed March 16, 2017 (Dkt. No. 310), a class action against Lyft alleging Lyft underpaid its drivers by classifying them as independent contractors, in which the court approved the percentage-based fee award requested by plaintiffs based on the following hourly rates:

| **Class** | **Rate** |
| --- | --- |
| 1996 | $800 |
| 2010 | 500 |
| 2014 | 325 |
| Paralegal | 200 |

      b.     *National Federation of the Blind of California v. Uber Technologies,*

*Inc.,* N.D. Cal. No. 14-cv-04086 NC, Order Granting Final Approval and Attorneys' Fees, filed

December 6, 2016 (Dkt. No. 139), a class action against Uber alleging that it violated federal

antidiscrimination laws by allowing its drivers to refuse to accept service dogs, in which the

court found the following 2016 hourly rates reasonable:

| Class | Rate |
|---|---|
| 1980 | $900 |
| 1985 | 895 |
| 1997 | 740 |
| 2005 | 645 |
| 2010 | 475 |
| 2011 | 460 |
| 2014 | 355 |
| Paralegals | 275 |
| Summer Associates | 275-280 |

      c.     *Wynn v. Chanos*, 2015 WL 3832561(N.D. Cal. 2015), filed June 19,

2015, an anti-SLAPP fee award, in which the court found the following hourly rates reasonable:

| Years of Experience | 2015/2014 Rates |
|---|---|
| 40 | $1085/1035 |
| 35 | 750 |
| 20 | 920/875 |
| 6 | 710/645 |
| 4 | 640/570 |

      d.     *Gutierrez v. Wells Fargo Bank, N.A*, 2015 WL 2438274 (N.D. Cal.

2015), filed May 21, 2015, an unfair business practices class action, in which the court found

the following hourly rates reasonable (before applying a 5.5 multiplier):

| Years of Bar Admission | Rate |
|---|---|
| 1972 | $975 |
| 1989 | 850 |
| 2001 | 625 |
| 2006 | 435 |
| 2009 | 435 |

| 2013 | 370 |
|---|---|
| Paralegals | 300-320 |
| Law Clerks | 325 |

e.    *Banas v. Volcano Corp.,* N.D. Cal. No. 3:12-cv-01535-WHO, Order
Granting in Part and Denying in Part Volcano's Motion for Attorneys' Fees and Costs, filed
December 12, 2014, a dispute over a merger agreement decided on summary judgment, in
which the court found the following hourly rates reasonable:

| **Level** | **Rate** |
|---|---|
| Partners and associates | $355-1,095 |
| E-discovery attorneys | 260-325 |
| Paralegals | 245-290 |

58.    Moreover, the rates requested by AW are in line with the non-contingent market
rates charged by attorneys of reasonably comparable experience, skill, and reputation for
reasonably comparable services and supported by surveys of legal rates, including the
following:

a.    In December 2015, Thomson Reuters published its "Legal Billing
Report," which surveys the rates approved for various law firms by the bankruptcy courts.
(Under bankruptcy law, the rates sought must be the firm's ordinary commercial rates.) A true
and correct copy of the Legal Billing Report is attached hereto as **Exhibit C**. It shows that
Class Counsel's rates are within the range of (if not less than) the rates found reasonable for
other law firms in New York and California.

b.    On January 5, 2015, the National Law Journal published an article about
its then current rate survey entitled "Billing Rates Rise, Discounts Abound." A true and correct
copy of that article is attached hereto as **Exhibit D**. It contains the rates charged by numerous
law firms handling comparably complex litigation. Class Counsel's rates are well in line with
those rates.

c.    According to the National Law Journal's 2014 Law Firm Billing Survey,
law firms with their largest office in New York have average partner and associate billing rates

21

of $882 and $520, respectively. Karen Sloan, *$1,000 Per Hour* Isn't *Rare Anymore; Nominal Billing Levels Rise, But Discounts Ease Blow*, National Law Journal, Jan. 13, 2014.  The survey also shows that it is common for legal fees for partners in New York firms to exceed $1,000 an hour. *Id.* A true and correct copy of this survey is attached hereto as **Exhibit E**.

        d.       The National Law Journal's December 2010, nationwide sampling of law firm billing rates (attached hereto as **Exhibit F**) lists 32 firms whose highest rate was $800 per hour or more, eleven firms whose highest rate was $900 per hour or more, and three firms whose highest rate was $1,000 per hour or more.

### AW'S REASONABLE EXPENSES

      59.     AW is seeking reimbursement of its reasonable out-of-pocket expenses incurred in this matter. It is my firm's practice to ensure that all costs and expenses are accurately assigned to the appropriate case. Below are the true and correct expenses my firm incurred in litigating this matter from inception through May 30, 2018, for which we are claiming reimbursement.  My firm's total expenses in this matter through May 30, 2018 come to $49,641.47. AW paid these expenses on a regular and timely basis as they were incurred, over the course of this litigation, without any guarantee of being reimbursed.  I certify to the Court that the foregoing expenses are correct, and have been necessarily incurred in this case.

| Description | Amount |
|---|---|
| Electronic Research & Pacer Fees | 282.84 |
| Expert Fee | 2,500.00 |
| Filing & Attorney Service Fees | $1,430.24 |
| Mediation Fees | $39,770.50 |
| Postage & Fedex | $187.47 |
| Printing (Outside Vendor) | 125.60 |
| Travel (Airfare, Ground Transport, Parking, Hotel) | $5,344.39 |
| **Total** | **$49,641.47** |

      60.     The foregoing expenses were incurred solely in connection with this litigation. These expenses are reflected in the books and records of my firm, which are kept in the ordinary course and prepared from expense vouchers, check records, and other documents.

61.     AW has not listed its expenses incurred for electronic research fees charged by Westlaw and LexisNexis (but seek reimbursement for such fees from other sources), in-house copies, facsimiles and telephone, mileage, meals, *etc.* and, in an exercise of discretion, does not seek reimbursement for such expenses. AW's travel expenses do not include meals or entertainment, and are limited to airfare, hotels, parking and ground transportation. Travel expenses were incurred as a result of travel to North Carolina, Bank of America's headquarters, as part of discovery efforts, and during mediation efforts.

62.     AW's costs and expenses are fully documented and reasonable.

63.     I am informed and believe that WBM and ZR incurred costs in the amount of $1,721.20 and $200, respectfully.

## CLASS REPRESENTATIVES' EFFORTS

64.     I am of the opinion that Ms. Pantelyat, Mr. Edwards, and Ms. Scherer's involvement in this case were critical. Each took his or her role as class representative seriously, devoting time and effort to protecting the interests of the class.  Without their willingness to assume the risks and responsibilities of serving as class representative, I do not believe such a strong result could have been achieved.

65.     The Class Representatives equipped AW with critical details regarding their accounts with Defendants. They assisted AW in investigating the claims at issue and reviewed pleadings and conferred with counsel. They were also consulted during the settlement process and reviewed the Settlement. In short, the Class Representatives assisted AW in pursuing this action on behalf of the Class, and their involvement in this case has been nothing short of essential.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct. Executed this 1st day of June, 2018, in Los Angeles, California.

Tina Wolfson

**<u>CERTIFICATE OF SERVICE</u>**

I, Tina Wolfson, hereby certify that a copy of the foregoing document, filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies shall be served by first class mail postage prepaid on all counsel who are not served through the CM/ECF system on June 1, 2018.

Tina Wolfson