**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NICOLETTA PANTELYAT, MICHAEL EDWARDS, and ISABELLE SCHERER, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA, N.A. and BANK OF AMERICA CORPORATION,<br><br>          Defendants | Civil Action No. 1:16-cv-08964-AJN |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL**

**APPROVAL OF CLASS ACTION SETTLEMENT**

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF FACTS ................................................................................... 3

       A.  Background and Pre-Settlement Procedural History ............................. 3

       B.  Settlement Negotiations and Mediation ................................................ 4

       C.  Preliminary Approval ........................................................................... 5

III.   TERMS OF THE SETTLEMENT ...................................................................... 6

       A.  The Settlement Class, Proposed Class Representatives, and Class Counsel .......... 6

       B.  The Settlement Fund and Payments to Settlement Class Members ..................... 6

       C.  Release ................................................................................................ 8

       D.  Notice Was Provided Pursuant to the Preliminary Approval Order ..................... 9

       E.  Opt-Outs, Objections, and Administration of the Settlement ..............................10

       F.  Attorneys' Fees and Expenses and Class Representative Service Awards ............11

IV.    ARGUMENT .....................................................................................................11

       A.  The Proposed Settlement Warrants Final Approval ..............................................11

            1.  The Settlement Is Presumptively Fair, Reasonable, and Adequate .................12

            2.  Application of the Grinnell Factors Demonstrates That the Settlement Is
                Substantively Fair, Reasonable, and Adequate.................................................14

                 a.  Litigation Through Trial Would Be Complex, Costly, and Long
                     (*Grinnell* Factor 1).....................................................................................15

                 b.  The Reaction of the Class Is Overwhelmingly Positive (*Grinnell* Factor
                     2)..................................................................................................................17

                 c.  The Substantial Amount of Discovery Completed Supports Approval of
                     the Settlement (*Grinnell* Factor 3) ...........................................................18

                 d.  The Risks of Establishing Liability, Damages, and Maintaining a Class
                     Action Through Trial Support Approval of the Settlement (*Grinnell*
                     Factors 4, 5, and 6) ......................................................................................19

                 e.  The Ability of Defendants to Withstand a Greater Judgment (*Grinnell*
                     Factor 7).......................................................................................................20

                 f.  The Settlement Is Reasonable (*Grinnell* Factor 8 and 9) ..........................21

       B.  Notice to the Settlement Class Satisfied All the Requirements of Rule 23 and
           Due Process ............................................................................................................23

       C.  Final Certification of the Settlement Class .............................................................24

V.     CONCLUSION ...................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015) ........................................................ 23

*Athale v. Sinotech Energy Ltd.*, No. 11-cv-05831-AJN, 2013 WL 11310686 (S.D.N.Y. Sept. 4, 2013) ................................................................................................................... 4

*Athale, et al. v. Sinotech Energy Limited, et al.*, Case No. 11-c-05831 (AJN), 2013 WL 11310686, 3 (S.D.N.Y. Sept. 4, 2013)................................................................................ 4

*Bellifemine v. Sanofi-Aventis U.S. LLC*, No. 07-cv-2207-JGK, 2010 WL 3119374 (S.D.N.Y. Aug. 6, 2010)................................................................................................... 19

*Bodnar v. Bank of Am.*, No. 5:14-cv-3224-EGS (E.D. Pa.).................................................. 22

*City of Providence v. Aeropostale, Inc.*, No. 11-cv-7132, 2014 WL 1883494 (S.D.N.Y. May 9, 2014) ................................................................................................................16, 23

*D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001)...............................................13, 15

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) .......................................................... 24

*Farrell v. Bank of Am.*, No. 3:16-cv-492-L-WVG (S.D. Cal.) .......................................... 22

*Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000)........................................ 15

*Hanlon v. Chrysler*, 150 F.3d 1011 (9th Cir. 1998) ........................................................... 17

*In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984) (2d Cir. 1987)............................................................................................................................ 21

In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 145 (2d Cir. 1987)............................... 21

*In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171 (S.D.N.Y. 2014).............. 24

*In re Am. Int'l Grp., Inc. Sec. Litig.*, 293 F.R.D. 459 (S.D.N.Y. 2013) ............................. 11

*In re AOL Time Warner Inc.*, No. 02-cv-5575-SWK, 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006)............................................................................................................................ 22

*In re Bear Stearns Co. Sec. Derivative and ERISA Litig.*, 909 F. Supp. 2d 259 (S.D.N.Y. 2012)............................................................................................................................ 18

*In re Citigroup Inc. Bond Litig.*, 296 F.R.D. 147 (S.D.N.Y. 2013) .................................... 11

*In re Citigroup Inc. Sec. Litig.*, 199 F. Supp. 3d 845 (S.D.N.Y. 2016)................................. 8

*In re Citigroup Inc. Sec. Litig.*, No. 09-cv-7359, 2014 WL 2112136 (S.D.N.Y. May 20, 2014)............................................................................................................................ 12

*In re Citigroup, Inc. Sec. Litig.*, 965 F. Supp. 2d 369 (S.D.N.Y. 2013).............................. 14

*In re Enron Corp. Sec. & ERISA Derivative Litig*, 228 F.R.D. 541 (S.D. Tex. 2005) ......... 22

## TABLE OF AUTHORITIES

### (continued)

Page

*In re Giant Interactive Group, Inc. Sec. Litig.*, 279 F.R.D. 151 (S.D.N.Y. 2011)...........13, 23

*In re Gilat Satellite Networks, Ltd.*, No. 02-cv-1510, 2007 WL 2743675 (E.D.N.Y. Sept. 18, 2007) ..................................................................................................................... 23

*In re Holocaust Victim Assets Litig.*, 424 F.3d 169 (2d Cir. 2005)........................................ 8

*In re IMAX Sec. Litig.,* 283 F.R.D. 178 (S.D.N.Y. 2012)................................................14, 15

*In re Indep. Energy Holdings PLC Sec. Litig.*, No. 00-cv-6689-SAS, 2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003)....................................................................................... 22

*In re Marsh ERISA Litig.*, 265 F.R.D. 128 (S.D.N.Y. 2010)............................................... 14

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02-md-1484, 2007 WL 313474 (S.D.N.Y. Jan. 31, 2007).................................................................................. 23

*In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297 (E.D.N.Y. 2010).................12, 17

*In re NASDAQ Mkt.–Makers Antitrust Litig.,* 187 F.R.D. 465 (S.D.N.Y. 1998) ................. 20

*In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104 (S.D.N.Y. 1997)............................ 19

*In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570 (S.D.N.Y. 2008)...................................... 12

*In re Vitamin C Antitrust Litig.*, No. 06-md-1738-BMC-JO, 2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012).........................................................................................17, 19

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) ................................. 20

*Massiah v. MetroPlus Health Plan, Inc.*, No. 11-cv-5669-BMC, 2012 WL 5874655 (E.D.N.Y. Nov. 20, 2012)............................................................................................ 17

*Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 618 (S.D.N.Y. 2012) ...........13, 21

*Mosser v. TD Bank, N.A. (In re Checking Account Overdraft Litig., MDL No. 2036)*, No. 09-md-2036-JLK, 2013 U.S. Dist. LEXIS 187627 (S.D. Fla. Mar. 18, 2013)................ 23

*Newman v. Stein*, 464 F.2d 689 (2d Cir. 1972).................................................................. 21

*Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997)......................................... 16

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011)..................................... 23

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254 (S.D.N.Y. 2003)........................................................................................................................ 16

*TBK Partners, Ltd. v. Western Union Corp.*, 517 F. Supp. 380 (S.D.N.Y. 1981)............... 15

TBK Partners, Ltd. v. Western Union Corp., 675 F.2d 456 (2d Cir. 1982) ....................... 15

*Thompson v. Metro Life Ins. Co.*, 216 F.R.D. 55 (S.D.N.Y. 2003) .................................... 14

*Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55 (S.D.N.Y. 2003).......................... 19

## <u>TABLE OF AUTHORITIES</u>

**(continued)**                                                                                    **Page**

*Torres v. Bank of Am. (In re Checking Account)*, 803 F. Supp. 2d 1330 (S.D. Fla. 2011) ... 23

*Torres v. Gristede's Operating Corp.*, No. 04-cv-3316-PAC, 2010 WL 5507892
  (S.D.N.Y. Dec. 21, 2010) ................................................................................ 18

*Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179 (D.D.C. 2011) ...................................... 23

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005) .................... 11, 12, 24

*Willix v. Healthfirst, Inc.*, No. 07-cv-1143-ENV-RER, 2011 WL 754862 (E.D.N.Y. Feb.
  18, 2011) ........................................................................................................ 19

*Wright v. Stern*, 553 F. Supp. 2d 337 (S.D.N.Y. 2008) ..................................................... 17

**RULES**

Fed. R. Civ. P. 23(c)(2)(B) ................................................................................... 24

Fed. R. Civ. P. 23(e)(2) ....................................................................................... 11

# I.    INTRODUCTION

The Court should finally approve the Settlement, an exemplary result in this novel class action. It creates a non-reversionary Settlement Fund in the amount of $22 million, or 80% of all of the revenues charged by Bank of America as result of Uber Overdraft Fees, which will be distributed through direct and proportionate payments to Class Members. Individual recoveries will amount to approximately $20 per Uber Overdraft Fee, and are particularly significant to this Settlement Class's demographics, and in relation to the total potential liability after trial.[1]   The Parties have complied with the Court's Order preliminarily approving the Settlement and directing notice, and are eager to distribute the much-needed funds to the Settlement Class upon the Court's final approval.

The response of the Settlement Class to the Settlement is overwhelmingly positive. Since this Court preliminarily approved the Settlement, the Settlement Administrator implemented the Court-approved direct notice program and reached approximately 98.8% of the certified Settlement Class, which consists of individuals holding 245,194 Bank of America accounts.  Among the entire Settlement Class, there were no bona-fide objections[2] and only 61 valid opt-outs, an unsurprising result given the value of the relief provided by the Settlement and the automatic, proportional distribution of such relief.  The positive reaction of the Class is compelling, objective evidence that the Settlement is fair, reasonable, and adequate, and the Court should have no hesitation in granting final approval to the

---

[1]    *Cf.* The Pew Charitable Trusts, "Heavy Overdrafters: A Financial Profile," at 1, April 2016, available at http://www.pewtrusts.org/~/media/assets/2016/04/heavyoverdrafters.pdf (last accessed July 4, 2018) (study finding that Americans who pay more than $100.00 in overdraft fees in a year generally have incomes below the U.S. average and, on average over the prior one-year period, had overdraft fees consume nearly a full week's worth of their household incomes).

[2]    An individual named Mr. Mohamed Diane sent a letter with enclosed documents, stating that "he was objecting to the settlement because I have some hardships going through my life."  This letter, however, was not a bona-fide objection because it did not relate to the Settlement.  Mr. Diane attempted to withdraw his objection on a telephone call with Class Counsel and requested that his Settlement Share be sent to him as soon as possible.  *See infra* Sec. III.E.

1

unopposed, preliminarily-approved Settlement.

The $22 million common fund created by the Settlement represents approximately 80% of the total revenues gleaned by Bank of America as a result of the overdraft fees at issue in this Action.  Bank of America deposited this non-reversionary fund in an interest-bearing account for the benefit of the Class shortly after the Court preliminarily approved the Settlement.  Following an order finally approving the Settlement, the fund will be distributed to Class Members automatically, after deduction of notice and administration costs, service awards, attorneys' fees, and expenses authorized by the Court.  Class Counsel estimate that each Class Member automatically will receive approximately $20 for each $35 overdraft fee charged by Defendants.

Rule 23 was specifically intended to serve as a mechanism for vindicating wide-spread injustices like the one alleged in this case, and to provide relief as quickly and efficiently as possible, as the Settlement distribution structure in this case provides.  Indeed, when compared to other approved settlements of cases challenging Defendants' and other banks' overdraft fees — which offer *far less* percentages of recovery for the Class — the fairness, reasonableness, and adequacy of the instant Settlement becomes even more apparent. *See infra* Sec. IV.A.2.f.

For the reasons set forth here and in the papers previously submitted in support of approval, including Plaintiffs' Unopposed Motion for Preliminary Approval of Class Settlement (Dkts. 63-68) and the Memorandum in Support of Service Awards, Attorneys' Fees and Expenses (Dkt. 80), Plaintiffs respectfully request that the Court grant final approval of the Settlement by: (1) finally certifying the Settlement Class; (2) approving the proposed Settlement Agreement as fair, adequate, and reasonable for the certified Settlement Class; (3) finding that the notice provided to the Settlement Class was adequate; (4) approving payments to the Settlement Administrator estimated to be $442,775 and not to exceed $450,000; (5) approving Class Counsel's requested attorneys' fees of $5,500,000 and reimbursement of $51,562.67 in out-of-pocket litigation costs; (6) approving an award of

$2,500 to each Plaintiff for their service as the Class Representatives; (7) overruling the Mohamed Diane so-called "objection"; and (8) entering the Final Approval Order and Judgment proposed by the Parties.

## II.   STATEMENT OF FACTS

**A.      Background and Pre-Settlement Procedural History**

Plaintiffs allege that Bank of America improperly assessed overdraft fees for debit card transactions with Uber.  (Dkt. 1, Class Action Complaint ("Complaint").)  The Complaint alleges that Bank of America promised, in its Deposit Agreement, that it would "not authorize overdrafts for everyday non-recurring debit card transactions and ATM transactions" and would "not charge . . . an Overdraft Item fee on an everyday non-recurring debit card transaction."  (*Id.* ¶¶24-35.)  The Deposit Agreement stated that: (i) "non-recurring" debit card transactions (which are not subject to overdraft fees) are "usually purchases made with your debit card or debit card number on a one-time or day-to-day basis [such as] groceries, gas, or coffee in the morning;" while (ii) "recurring" debit card transactions (which are subject to overdraft fees) are "transactions that …[are] set up to occur automatically, such as automatic bill payments."  (*Id.*)  Despite these express contractual provisions, Bank of America systematically charged $35 overdraft fees on rides with Uber that are non-recurring debit card transactions.  (*Id.*)

Class Counsel's extensive investigation into the facts underlying this case began approximately seven months prior to the filing of the Complaint, in April of 2016.  (See Dkt. 81, Declaration of Tina Wolfson in support of the Service Awards and Attorneys' Fees and Expenses application ("Wolfson Decl."), ¶¶3.a.–3.q. for a full and detailed account of such investigations.)  The Complaint was filed on November 17, 2016.

On January 9, 2017, Defendants moved to dismiss the Complaint and all of its causes of action for failure to state a claim.  (Dkts. 21-23.)  On February 13, 2017, Plaintiff Pantelyat filed an Opposition to Defendants' Motion to Dismiss (Dkt. 34), and the Defendants filed their reply on February 27, 2017.  (Dkt. 36.)  Thereafter, the Parties

negotiated and filed a Protective Order and ESI Protocol.  (Dkt. 38.)

On or about April 7, 2017, Bank of America's Deposit Agreement was revised to include the following additional sentence relevant to the claims alleged in the Action: "*We rely on the merchant that processes the transaction to determine if it is a recurring transaction or an everyday non-recurring transaction*."  (Dkt. 65-1, Settlement Agreement ("SA") p. 2.)

**B.      Settlement Negotiations and Mediation**

After the Motion to Dismiss was filed, the Parties commenced discussions regarding the possibility of resolving this matter.  (Wolfson Decl. Dkt. 81 ¶8.)  After months of discussions and preliminary negotiations, during which Class Counsel conducted discovery and consulted with experts, the Parties agreed to attend mediation with the Honorable Daniel Weinstein (Ret.) of JAMS.  (*Id.* ¶9)  Judge Weinstein is a well-recognized, respected, and experienced class action mediator.  *See* www.jamsadr.com/weinstein (last visited July 6, 2017); *see also Athale v. Sinotech Energy Ltd.*, No. 11-cv-05831-AJN, 2013 WL 11310686, at *3 (S.D.N.Y. Sept. 4, 2013) (recognizing Judge Weinstein as an experienced mediator). Judge Weinstein was assisted in all the mediations conducted in this matter by another respected and experienced mediator, Lizbeth Hasse (*see* www.jamsadr.com/hasse (last visited July 6, 2017).  The Parties ultimately participated in three separate mediations on June 20, 2017, August 3, 2017, and on October 13, 2017, when the Parties finally reached an agreement in principal.  (Wolfson Decl., Dkt. 81 ¶¶9-11.)

Before and during all settlement discussions and mediations, the Parties exchanged sufficient information to permit Plaintiffs and Class Counsel to evaluate the claims and potential defenses and to meaningfully conduct informed settlement discussions.  (*Id.* ¶17.)

Discovery revealed, *inter alia*, the following salient facts: during the Class Period of

January 1, 2012 to December 31, 2016 (i) 245,194[3] accounts were charged one or more $35 Uber Overdraft Fees that were not refunded; (ii) Bank of America charged 774,984 separate Uber Overdraft Fees that were not refunded; (iii) Bank of America charged a total of $27,124,440 in such overdraft fees. (*Id.* ¶14.)[4] Class Counsel also obtained a list of individuals holding the aforementioned accounts and the number of Uber Overdraft Fees charged to each account. (*Id.* ¶15.)

After the mediations, the Parties engaged in additional and extensive negotiations, through many telephone discussions and a number of in-person meetings, to finalize and memorialize all aspects of the Settlement Agreement, including each of its exhibits. (*Id.* ¶18.) Also, after a competitive bidding process amongst well known national settlement administration companies, the Parties engaged Epiq Systems, Inc. ("Epiq") to advise regarding the mechanics of the Settlement, the notice process, and to administer the Settlement. (*Id.* ¶19.) The notice program and each document comprising the notice were negotiated and exhaustively refined, with input from experts at Epiq, to make them easy to read and understand. (*Id.*; *see also generally* Declaration of Cameron Azari filed in support of Motion for Preliminary Approval ("Azari Prelim. Decl."), Dkt. 66.)

**C.    Preliminary Approval**

On January 1, 2018, after finalizing the Settlement Agreement, Plaintiff filed a Motion for Preliminary Approval of Class Action Settlement (Dkt. Nos. 63–68), accompanied by the proposed Settlement Agreement. (Dkt. No. 65-1.) The Court granted preliminary approval on March 21, 2018. (Dkt. No. 71.)

---

[3]     Plaintiffs' Motion for Preliminary Approval reported that 245,200 accounts were charged an Uber Overdraft Fee (*see, e.g.* Dkt. 64, p.1.), however, further analysis of the data set, performed after preliminary approval, showed that six of those accounts included in the data set were in fact not charged an Uber Overdraft Fee.

[4]     Class Counsel also established that Bank of America charged a total of $30,285,430 in Uber Overdraft Fees but that $3,160,990 of this amount was refunded. In total, Bank of America charged 865,298 Uber Overdraft Fees of $35 apiece, and refunded 90,314 of these fees into 26,742 accounts. (Declaration of Robert Ahdoot filed in support of Motion for Preliminary Approval ("Ahdoot Prelim. Decl."), Dkt. 65 ¶14.)

Additionally, with the Court's leave, Plaintiffs filed the Amended Class Action Complaint, adding Class Representatives Michael Edwards and Isabelle Scherer, with Class Counsel's Co-Plaintiffs' Counsel, the law firms of Whitfield, Bryson & Mason, LLP ("WBM") and Zimmerman Reed, LLP ("ZR"), appearing in this Action for the first time. (Dkts. 72, 72-1-72-12.)  Rather than filing separate similar class actions against Bank of America, these parties cooperated with Class Counsel in the Action and this Settlement to ensure an organized and efficient effort on behalf of the putative Class.  Both WBM and ZR, experienced class action litigation firms, reviewed the terms of the Settlement and agreed that the Settlement was in the best interests of the class and eminently fair, reasonable, and adequate. (Wolfson Decl. Dkt. 81 ¶23.)

## III.   TERMS OF THE SETTLEMENT

### A.   The Settlement Class, Proposed Class Representatives, and Class Counsel

Pursuant to the Settlement Agreement, the Court preliminary certified the following stipulated Settlement Class:

> all holders of consumer deposit accounts with Bank of America, N.A. in the United States who were charged (and not refunded or credited) overdraft fees on debit card transactions made with Uber between January 1, 2012 and December 31, 2016 that were coded (or classified) by the merchant as recurring transactions.   Excluded from the Settlement Class are (a) all persons who are employees, directors, and officers of Bank of America, N.A. and Bank of America Corporation; (b) the Judge presiding over this Action; and (c) the Court staff.

(Preliminary Approval Order, Dkt. 71 ¶2; SA ¶35.)

The Court also preliminary designated Plaintiffs Nicoletta Pantelyat, Michael Edwards, and Isabelle Scherer, as Class Representatives, and Tina Wolfson and Robert Ahdoot of Ahdoot & Wolfson, PC as Class Counsel.  (Preliminary Approval Order, Dkt. 71 ¶3-4; SA ¶¶38, 6.)

### B.   The Settlement Fund and Payments to Settlement Class Members

The Settlement requires Bank of America to pay and create a Settlement Fund by

6

depositing $22 million dollars into an interest-bearing Escrow Account (to be administered by the Settlement Administrator) following entry of a Preliminary Approval Order.  (SA ¶79.)  Bank of America complied with this requirement, and as of June 29, 2018, $59,789.27 of interest has accrued for the benefit of the Class.  (Declaration of Cameron Azari, filed concurrently herewith ("Azari Decl.") ¶26.)

In the event the Court approves the Settlement, the Settlement Fund automatically will be distributed to Settlement Class Members after deduction of the following: (i) the Settlement's Administration Expenses (estimated to be $442,775 and capped by Epiq at $450,000 (Azari Prelim. Decl. Dkt. 66 ¶9)), (ii) any attorneys' fees and expenses approved by the Court, (iii) any Service Awards approved by the Court, and (iv) any Taxes due on the interest earned by the Escrow Account.  (SA ¶82.)

The Settlement Fund Balance will be automatically distributed to Settlement Class Members automatically, *pro rata*, in proportion to the number of Uber Overdraft Fees each Settlement Class Member incurred.  (*Id*. ¶85.)  Each Settlement Class Member who paid at least one Uber Overdraft Fee is entitled to receive a Settlement Share.  (*Id*. ¶83.)  The Settlement Administrator will calculate each Settlement Class Member's Settlement Share as follows: the Settlement Fund Balance will be divided by the total number of all Uber Overdraft Fees paid by Settlement Class Members, to yield a per-Uber-Overdraft-Fee amount.  (*Id*. ¶85.)  Each Settlement Class Member's Settlement Share shall equal the per-Uber-Overdraft-Fee amount multiplied by the number of Uber Overdraft Fee(s) paid by that Settlement Class Member.  (*Id.*)

For example, assuming the final Administration Expenses are $450,000, and that the Court approves the requested Service Awards of $7,500 total, and the requested Attorneys' Fee and Expense Award of $5,500,000, the per-Uber Overdraft Fee compensation would equal $20.70 based on the total number of Uber Overdraft Fees charged to Settlement Class

Members (774,984 - 153 (overdraft fees of opt-outs (Azari Decil. ¶21.A.).[5]  Thus, under this

example, a Settlement Class Member who was charged one Uber Overdraft Fee will have a

Settlement Share that equals $20.70, a Settlement Class Member charged for two will

receive $41.14, *etc*.  There is no cap on the amount of any Settlement Class Member's

recovery under the Settlement.

Each Settlement Class Member's Settlement Share will be distributed automatically

as follows: (i) for those with open Bank of America accounts (as of the Effective Date), by a

credit to their account *(*SA ¶86.), and (ii) for those with closed Bank of America accounts,

by check via U.S. Mail *(Id*.¶87).  Any Residual Funds will be redistributed to (i) Settlement

Class Members who have open accounts, and (ii) Settlement Class Members who have

closed accounts and who cashed their previous checks.  *(Id*.¶89.)  In the event Residual

Funds equal less than $5 per such Settlement Class Members, they would be paid to the

Center for Responsible Lending ("CRL"), a non-profit organization that more than

reasonably approximates the interests of the Settlement Class.  *(Id*.¶91; *See also* Declaration

of Deborah Goldstein of CRL (Dkt. 67).)[6]

**C.      Release**

As detailed in the Settlement Agreement, should the Court grant Final Approval,

Plaintiffs and Settlement Class Members will discharge Bank of America and Uber from any

claims that: (a) were or could have been asserted in the Action; (b) arise out of, relate to, or

are in connection with the assessment of overdraft fees on one-time, non-recurring Uber

---

[5]      (22,000,000 - (450,000 + 7,500 + 5,500,000))) / 774,831 = 20.70.  This estimate does
not account for (i) interest earned on the Settlement Fund (less Taxes), and (ii) the number
of opt-outs — both of which can only increase this estimate. The Settlement Administrator
has not determined the amount of taxes due, if any, at this time. (Azari Decl. ¶28.)

[6]      *See In re Citigroup Inc. Sec. Litig.*, 199 F. Supp. 3d 845, 852, 854 (S.D.N.Y. 2016)
("[T]his Court will approve counsel's proposed *cy pres* designees if those … organizations
"reasonably approximate" the interests of the class. This standard best preserves the district
court's " 'broad supervisory powers ... with respect to the administration and allocation of
settlement funds,' " *In re Holocaust Victim Assets Litig.*, 424 F.3d 169, 172 (2d Cir. 2005)
(citation omitted); Fed. R. Civ. P. 23(e), and appropriately gives the Court needed flexibility
to review the designations class counsel has proposed.")

transactions; or (c) arise out of, relate to, or are in connection with the administration of the Settlement.  (SA ¶¶101-104.)  The released claims do not include any claims that arise out of the assessment of an overdraft fee by Defendants on any transaction other than an Uber transaction.  (*Id.* ¶101.)  Further, the Release only applies to the persons identified on the Settlement Class Member List, or those who were sent the Class Notice.  (*Id.* ¶¶36, 39, 101.)

**D.      Notice Was Provided Pursuant to the Preliminary Approval Order**

At preliminary approval, the Court approved the Parties' proposed Notice Plan, finding it met the requirements of Rule 23 and Due Process.  (Preliminary Approval Order, Dkt. 71 ¶7-8.)  The Plan now has been fully carried out by the professional settlement administrator Epiq.  In accordance with the Settlement, Bank of America (i) disseminated notice pursuant to the requirements of Class Action Fairness Act, 28 U.S.C. §1715, *et seq.* (Declaration of Patrice E. Hendriksen, ¶¶2-4); and (ii) provided Epiq with the names and addresses of all potential Settlement Class Members and the number of Uber Overdrafts charges to each affected account.  (*Id.* ¶¶5-6.)

After Epiq accounted for duplicate addresses, updated all addresses on the National Change of Address database maintained by the USPS, and removed six accounts that did not have an Uber Overdraft charge, Epiq mailed 244,184 Class Notices directly to Settlement Class Members.  (Azari Decl. ¶¶9-12, 24-25 & Exhibit A (exemplar of the mailed Class Notice).)  If Class Notices were returned undeliverable, Epiq sent the Class Notice to all addresses that could be updated through LexisNexis.  (*Id.* ¶13.)  The Class Notice was e-mailed to certain Settlement Class Members for whom a deliverable address could not be determined after following these steps.  (*Id.* ¶¶13-14 and Exhibit B (exemplar of the emailed Class Notice).)  Ultimately, the Court-approved notice successfully reached 98.8% of the Settlement Class directly.  (*Id.* ¶16.)

The Class Notices directed Settlement Class Members to the Settlement Website (www.rideoverdraftsettlement.com), where they were able to: submit opt-outs; access pleadings, including the Settlement Agreement, Preliminary Approval Order, and Motion for

Service Awards and Attorneys' Fees; and see deadlines and answers to frequently asked questions. (*Id.* ¶¶17-18; *see generally* www.rideoverdraftsettlement.com (last visited July 6, 2018).) In addition, a toll-free phone number was established to provide Settlement Class Members with additional information, answers to FAQs, and to allow them to request that a Class Notice be mailed to them. (Azari Decl. ¶19.) Finally, a post office box and email address were established, to allow Settlement Class Members to contact the Settlement Administrator by mail and/or email with any specific requests or questions. (*Id.* ¶20.)

**E.     Opt-Outs, Objections, and Administration of the Settlement**

The deadline to request exclusion from the Settlement or to object to the Settlement passed on June 22, 2018. To date, Epiq has received 61 valid requests for exclusion from the Settlement Class (*via* online submission or mail).[7] (*Id.* ¶21.A.)

There were no objections to the Settlement. An individual named Mr. Mohamed Diane did send a letter, with enclosed documents, which stated that "he was objecting to the settlement because I have some hardships going through my life." Neither the letter (which was filed on the docket in redacted form) nor the enclosed documents provided any relevant reason for the purported objection or even related to the Settlement. (Dkt. 87.) Class Counsel reached out to Mr. Diane at the telephone number provided. (Declaration of Robert Ahdoot, filed concurrently herewith ("Ahdoot Decl.") ¶¶3-4.) Mr. Diane explained that he submitted his letter because he could not pay Bank of America any money. (*Id.* ¶¶5-7.) In response, Class Counsel explained to Mr. Diane that the Settlement did not require payment of anything to Bank of America, but rather, the Settlement (if approved) would require Bank of America to pay him approximately $20 for each Uber Overdraft charged to his account.

---

[7]     As of the June 22, 2018 Opt-Out Deadline, Epiq received 84 unique requests for exclusion. Epiq determined 61 of these opt outs to valid, 5 incomplete, and the remaining 18 did not provide sufficient information to identify the individual as part of the Settlement Class. (Azari Decl. ¶¶ 21, 21.A. – 21.B.). Epiq will continue to attempt to authenticate the invalid opt-outs and will provide an update prior to the Final Hearing, which Class Counsel will present to the Court.

(*Id.* ¶8)  Mr. Diane then requested that the Settlement money be sent to him as soon as possible and orally withdrew his purported objection.  (*Id.* ¶¶8-9.)

Pursuant to the Settlement, all Settlement Administration Expenses to date have been and will continue to be paid from the Settlement Fund.  To date, Epiq has invoiced $134,260.14, which has been paid out of the Escrow Account.  (Azari Decl. ¶¶26-28.)

**F.     Attorneys' Fees and Expenses and Class Representative Service Awards**

On June 21, 2018, 21 days prior to the Opt-Out and Objection Deadline, as required by the Settlement Agreement (SA ¶94), Class Counsel filed a Motion for Award of Service Payments to Class Representatives, Award of Attorneys' Fees, and Reimbursement of Expenses (Dkts. 79 to 86).  That Motion seeks a $2,500 Service Award on behalf of each of the three Class Representatives ($7,500 total), attorneys' fees in the amount of 25% of the Settlement Fund (*i.e.* $5,500,000), and reimbursement of costs in the amount of $51,562.67, all to be paid from the Settlement Fund.  In accordance with the Settlement Agreement and Preliminary Approval Order, the Motion, the supporting memorandum of law, declarations, and exhibits were all made available on the Settlement Website.  (*See e.g.* www.rideoverdraftsettlement.com/Home/Documents (last visited July 6, 2018).)  The Parties only negotiated the amount of the proposed service awards and attorneys' fees after first reaching an agreement upon the relief provided to the Settlement Class.  (SA ¶99; Wolfson Decl. Dkt. 81 ¶18.)

**IV.   ARGUMENT**

**A.     The Proposed Settlement Warrants Final Approval**

Rule 23(e) provides that a class-action settlement must be presented to the Court for approval, and should be approved if the Court finds it "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2); *see In re Citigroup Inc. Bond Litig.*, 296 F.R.D. 147, 154 (S.D.N.Y. 2013); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 293 F.R.D. 459, 464 (S.D.N.Y. 2013).  Public policy favors the settlement of disputed claims among private litigants, particularly in class actions. *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116–17 (2d Cir. 2005)

("We are mindful of the strong judicial policy in favor of settlements, particularly in the class action context.").  Moreover, in ruling on final approval of a class settlement, "the Court should consider both the process by which the settlement agreement was negotiated and the substantive fairness of the agreed-upon terms in light of the circumstances of the litigation."  *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 330 (E.D.N.Y. 2010); *see also Wal-Mart*, 396 F.3d at 116; *In re Citigroup Inc. Sec. Litig.*, No. 09-cv-7359, 2014 WL 2112136, at *2–3 (S.D.N.Y. May 20, 2014).

As set forth below, the extensive investigation, discovery, and settlement negotiations performed in this case, by a well-experienced group of attorneys, render the Settlement presumptively fair, reasonable, and adequate.  The fairness, reasonableness, and adequacy of the Settlement is confirmed by each of the various additional "*Grinnell*" factors that district courts of the Second Circuit consider at the final approval stage of the settlement process.

### 1.    The Settlement Is Presumptively Fair, Reasonable, and Adequate

A "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery."  *Wal-Mart*, 396 F.3d at 116; *see also In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 576 (S.D.N.Y. 2008) ("[A] strong presumption of fairness attaches to a class action settlement reached in arm's length negotiations among able counsel.").

The preliminarily approved Settlement was achieved through extensive arm's-length negotiations between the Parties and their counsel who have considerable experience litigating class action matters.  (*See, e.g.*, Wolfson Decl., Dkt. 81 ¶¶21, 23-25.)  Class Counsel conducted discovery, investigated the facts and underlying events relating to the subject matter of the claims, and thoroughly researched and analyzed every aspect of the applicable law.  (*Id.* ¶13-14.) Class Counsel, *inter alia*, investigated the claims at issue by obtaining Bank of America's various contracts with account holders and merchants, interviewing many Bank of America account holders regarding Bank of America's

12

practices, and reviewing hundreds of account statements and other account-related documents in detail.  (*Id.* ¶3.)  Class Counsel also interviewed Bank of America employees, served requests for production of documents, and obtained verified information from Bank of America concerning the size and scope of the Settlement Class and the number of Uber Overdraft Fees collected and reimbursed during the Class Period.  (*Id.*)  Moreover, the negotiations leading to Settlement occurred over the course of many months and included three in-person mediations under the supervision of highly respected JAMS mediators, Hon. Daniel Weinstein (Ret.) and Lizbeth Hasse, Esq., and numerous other telephonic and in-person discussions.  (*Id.* ¶¶10-12, 18.)  The outstanding result for the Settlement Class was the product of these hard-fought negotiations.

That the Settlement was achieved as a result of such extensive, arm's-length settlement negotiations, overseen by an experienced and well-respected mediator, renders the Settlement presumptively fair, reasonable, and adequate, and free of any collusion.  *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a mediator's involvement in settlement negotiations "helps to ensure that the proceedings were free of collusion and undue pressure"); *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 618 (S.D.N.Y. 2012) ("The involvement of . . . an experienced and well-known . . . class action mediator, is also a strong indicator of procedural fairness."); *In re Giant Interactive Group, Inc. Sec. Litig.*, 279 F.R.D. 151, 160 (S.D.N.Y. 2011) ("[C]ounsel have provided the Court significant evidence demonstrating that this settlement was the product of prolonged, arms-length negotiation, including as facilitated by a respected mediator.").

The Settlement achieved through these considerable efforts is strongly supported by Plaintiffs and Class Counsel, who firmly believe the Settlement is in the best interests of the Settlement Class.  (*See, e.g.*, Wolfson Decl. Dkt. 81 ¶23; Ahdoot Prelim. Decl. ¶32; Declaration of Nicoletta Pantelyat, Dkt. 84 ¶7; Declaration of Michael Edwards, Dkt. 85 ¶7; Declaration of Isabelle Scherer, Dkt. 86 ¶7.)  Class Counsel at Ahdoot & Wolfson, PC are highly experienced in consumer class actions and well versed in the applicable law and facts

presented in the Action.  *See* Wolfson Decl. Dkt. 81 ¶¶32-41 and Exhibit B (AW's firm

experience and resume); *see also In re IMAX Sec. Litig.,* 283 F.R.D. 178, 189 (S.D.N.Y.

2012) ("[G]reat weight is accorded to the recommendations of counsel, who are most

closely acquainted with the facts of the underlying litigation.").  The substantial benefit to

the Settlement Class provided by the Settlement, achieved in the face of significant expense,

risk, and uncertainties of litigation, is a function of the substantial knowledge, expertise, and

effort that Class Counsel brought to bear in the prosecution of this litigation.

     The Settlement's distribution plan does not provide preferential treatment to Class

Representatives or to any other Settlement Class Members.  The proposed plan to

automatically distribute the proceeds of the Settlement provides a fair and reasonable

method to allocate the Net Settlement Fund among all of the Settlement Class Members.

(SA ¶¶82-92.)  The Net Settlement Fund will be allocated to the Class Members based on

the relative size of each of their claims, *i.e.*, the number of Uber Overdraft Fees each was

charged.  The proposed plan could not be more equitable, and courts in this District

repeatedly have approved similar plans.  *See In re Citigroup, Inc. Sec. Litig.*, 965 F. Supp.

2d 369, 386-87 (S.D.N.Y. 2013); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 145-46

(S.D.N.Y. 2010).

     Given the simple and efficient procedural terms, and the highly-beneficial

substantive terms of the Settlement, as outlined above, the Settlement is presumptively fair

and reasonable and should be granted final approval. *See Thompson v. Metro Life Ins. Co.*,

216 F.R.D. 55, 61 (S.D.N.Y. 2003) ("A strong presumption of fairness attaches to proposed

settlements that have been negotiated at arms-length.").

    **2.**    **Application of the *Grinnell* Factors Demonstrates That the Settlement Is**
            **Substantively Fair, Reasonable, and Adequate**

     Moreover, all of the other factors considered at the final approval stage in the Second

Circuit weigh in favor of finding that the Settlement is fair, reasonable, and adequate. In *City

of Detroit v. Grinnell Corporation*, the Second Circuit identified nine factors that courts

should consider when determining whether to finally approve a settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).  "[N]ot every factor must weigh in favor of settlement[;] rather [a] court should consider the totality of these factors in light of the particular circumstances." *In re IMAX*, 283 F.R.D. at 189.  In this case, each of the factors weighs in favor of granting final approval of the Settlement.

### a.    Litigation Through Trial Would Be Complex, Costly, and Long (*Grinnell* Factor 1)

The proposed Settlement provides the Settlement Class with substantial and certain relief, without the delay and expense of motion practice, discovery, class certification, trial, or post-trial proceedings.  "Most class actions are inherently complex and settlement avoids the costs, delays and multitude of other problems associated with them." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000), *aff'd sub. nom. D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001).  Courts have consistently held that, unless the proposed settlement is clearly inadequate, its acceptance and approval are preferable to the continuation of lengthy and expensive litigation with uncertain results. *TBK Partners, Ltd. v. Western Union Corp.*, 517 F. Supp. 380, 389 (S.D.N.Y. 1981), *aff'd*, 675 F.2d 456 (2d Cir. 1982).

This case is no exception.  In the event the Parties had not reached a Settlement, the next steps in the litigation would have been adjudication of Defendants' Motion to Dismiss, depositions of the Parties, extensive third-party discovery, and contested motions for summary judgment and for class certification, which at a minimum would be costly and

time-consuming for the Parties and the Court, and would create the risk that a litigation class

would not be certified and/or that the Class would recover nothing at all.  More specifically,

Plaintiffs are aware that Defendants would continue to assert a number of defenses on the

merits, including arguments that the contract authorized the subject overdraft fees and that

Plaintiffs' claims were barred for failure to comply with a 60-day notification provision in

the Deposit Agreement.  Plaintiffs continue to believe that they could overcome such

defenses, but litigation is inherently uncertain and a loss on either of these or other defenses

would have entailed dismissal of Plaintiffs' claims and no recovery for the Settlement Class.

Looking beyond trial, Defendants could appeal any adverse class certification or

merits decisions.  Even a trial win would not guarantee a recovery to the Class, in light of

the risk of reversal on appeal.  *See, e.g.*, *Robbins v. Koger Props., Inc.,* 116 F.3d 1441, 1449

(11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice).

Delay, not just at the trial stage, but also through post-trial motions and the appellate

process, could force Settlement Class Members to wait even longer for any recovery, further

reducing its value.  *City of Providence v. Aeropostale, Inc.*, No. 11-cv-7132, 2014 WL

1883494, at *5 (S.D.N.Y. May 9, 2014) (finding that "[e]ven if the Class could recover a

judgment at trial, the additional delay through trial, post-trial motions, and the appellate

process could prevent the Class from obtaining any recovery for years.").

Settlement of this litigation ensures a recovery now — of approximately 80% of the

total amount of money charged by Bank of America as a result of Uber Overdrafts — and

avoids the risk of no recovery at all, whether at trial or on appeal, as well as the additional

costs posed by continued litigation.  Against this backdrop, the timely, certain, and

meaningful relief provided by the Settlement is clearly in the best interest of the Class.

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y.

2003) ("[E]ven if a shareholder or class member was willing to assume all the risks of

pursuing the actions through further litigation and trial, the passage of time would introduce

yet more risks in terms of appeals and possible changes in the law and would, in light of the

time value of money, make future recoveries less valuable than this current recovery.").
Accordingly, the first *Grinnell* factor plainly weighs in favor of final approval.

> **b.      The Reaction of the Class Is Overwhelmingly Positive (*Grinnell* Factor 2)**

The reaction of the class to a proposed settlement is a significant factor to be weighed in considering its fairness and adequacy.  *In re Vitamin C Antitrust Litig.*, No. 06-md-1738-BMC-JO, 2012 WL 5289514, at *4 (E.D.N.Y. Oct. 23, 2012).  "It is well settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy." *In re MetLife Demutualization*, 689 F. Supp. 2d at 333 (internal quotation marks omitted).  This "significant" factor weighs heavily in favor of final approval.

Here, the reaction of the Class Members to the Settlement has been overwhelmingly positive.  Class Notice has been provided to the Settlement Class Members in accordance with the requirements of Rule 23(c)(2)(B) and the Preliminary Approval Order (Dkt. 71 ¶¶7-8), and direct notice reached 98.8 % of the Settlement Class.  (Azari Decl. ¶16.)  Also, only 61 Class Members submitted valid opt-out requests. (*Id.* ¶21.A.)  This exceptional participation rate and lack of objections from the Settlement Class leaves no question that the Class Members view the Settlement favorably, which weighs heavily in favor of final approval. *See, e.g., Hanlon v. Chrysler*, 150 F.3d 1011, 1027 (9th Cir. 1998) ("[T]he fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness."); *Massiah v. MetroPlus Health Plan, Inc.*, No. 11-cv-5669-BMC, 2012 WL 5874655, at *4 (E.D.N.Y. Nov. 20, 2012) ("'The fact that the majority of class members neither objected nor opted out is a strong indication' of fairness.") (quoting *Wright v. Stern*, 553 F. Supp. 2d 337, 344-45 (S.D.N.Y. 2008)). Consequently, the second *Grinnell* factor weighs in favor of final approval of the Settlement.

> c.     The Substantial Amount of Discovery Completed Supports
>        Approval of the Settlement (*Grinnell* Factor 3)

As discussed above, the Parties have conducted substantial discovery, including document and data production, the amount of potential recovery, independent investigations, and interviews of Bank of America employees.  (Wolfson Decl., Dkt. 81 ¶¶3-4.)  Class Counsel's experience in similar matters, as well as the efforts made by counsel on both sides confirm that they are sufficiently well apprised of the facts of this action, and the strengths and weaknesses of the cases, to make an intelligent analysis of the proposed Settlement.

"The pertinent question is whether counsel had an adequate appreciation of the merits of the case before negotiating." *Torres v. Gristede's Operating Corp.*, No. 04-cv-3316-PAC, 2010 WL 5507892, at *5 (S.D.N.Y. Dec. 21, 2010) (internal quotation omitted). "[T]he pretrial negotiations and discovery must be sufficiently adversarial that they are not designed to justify a settlement . . . but an aggressive effort to ferret out facts helpful to the prosecution of the suit." *In re Austrian & German Bank*, 80 F. Supp. 2d at 176 ("To approve a proposed settlement, the Court need not find that the parties have engaged in extensive discovery . . . it is enough for the parties to have engaged in sufficient investigation of the facts to enable the Court to intelligently make . . . an appraisal of the Settlement."); *In re Bear Stearns Co. Sec. Derivative and ERISA Litig.*, 909 F. Supp. 2d 259, 267 (S.D.N.Y. 2012) ("[T]he question is whether the parties had adequate information about their claims such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiff's causes of action for purposes of settlement").

As noted above, Class Counsel conducted extensive investigation, analysis, and discovery concerning every aspect of this case before negotiating the Settlement, enabling them to intelligently assess the strengths and weaknesses of the Settlement Class Members' case and to determine the full scope of the damages at issue.  The information accumulated through Class Counsel's investigation and discovery efforts allowed them to vigorously negotiate on behalf of the Settlement Class with the Defendants, and ultimately achieve the

Settlement.  Accordingly, the third *Grinnell* factor weighs in favor of final approval.

> d.  **The Risks of Establishing Liability, Damages, and Maintaining a Class Action Through Trial Support Approval of the Settlement (*Grinnell* Factors 4, 5, and 6)**

"The fourth, fifth, and sixth Grinnell factors all relate to continued litigation risks," *i.e.*, the risks of establishing liability, damages and maintaining the class action through trial. *In re Vitamin C*, 2012 WL 5289514, at \*5.  Courts routinely approve settlements where plaintiffs would have faced significant legal and factual obstacles to establishing liability. *Thompson*, 216 F.R.D. at 63.  Indeed, "'[l]itigation inherently involves risks.'"  *Willix v. Healthfirst, Inc.*, No. 07-cv-1143-ENV-RER, 2011 WL 754862, at \*4 (E.D.N.Y. Feb. 18, 2011) (quoting *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 126 (S.D.N.Y. 1997)).  "One purpose of a settlement is to avoid the uncertainty of a trial on the merits." *Id.*

Although Plaintiffs' case is strong, class certification, summary judgment, trial, and then appeals would nonetheless pose substantial risks of non-recovery.  The defenses addressed in relation to the first *Grinnell* factor present the risk of zero recovery.  Without a settlement, Bank of America would litigate the case vigorously, forcing Plaintiffs to overcome dispositive motions and to win a contested certification motion.  *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004).

The Court's determination as to the propriety of class-treatment in this case would occur only after decision on Defendants' Motion to Dismiss, completion of class-related discovery, and a lengthy class certification briefing process in which Defendants would argue against certification.  If Plaintiffs prevailed and a class were certified, Defendants likely would attempt to continue their challenge to certification through a Rule 23(f) application, and could move to decertify the class, forcing additional rounds of briefing. The process would be lengthy, expensive, and risky.  *See Bellifemine v. Sanofi-Aventis U.S. LLC*, No. 07-cv-2207-JGK, 2010 WL 3119374, at \*4 (S.D.N.Y. Aug. 6, 2010) (noting that there "is no assurance of obtaining class certification through trial, because a court can reevaluate the appropriateness of certification at any time during the proceedings"); *In re*

*NASDAQ Mkt.–Makers Antitrust Litig.,* 187 F.R.D. 465, 476–77 (S.D.N.Y. 1998) (risk of class being decertified at trial or risk of class certification being reversed on appeal supported approval of settlement).

The Court "must only weigh the likelihood of success by the plaintiff class against the relief offered by the settlement." *In re Austrian & German Bank*, 80 F. Supp. 2d at 177 (internal quotations omitted).  Here, Plaintiffs and the Class face risks in overcoming Defendants' motion to dismiss, a potential motion for summary judgment, and various defenses in opposition to certification.  The Settlement alleviates these risks, and provides a substantial benefit to the Class in a timely fashion.  While Plaintiffs are confident that they could certify a class and prevail on the merits, they also recognize there is no guarantee of success or that any judgment in their favor would be upheld on appeal.  Accordingly, absent the Settlement, the Settlement Class would face real risks of recovering nothing, or an amount significantly less than the total Settlement Amount.  The Settlement Class's automatic, proportional recovery of $22 million — 80% of the total amount of money Bank of America collected from the Settlement Class in Uber Overdrafts — when weighed against the risks posed by continued litigation, weighs heavily in favor of final approval.

The proposed Settlement eliminates risk, expense, and delay. Accordingly, the fourth, fifth, and sixth *Grinnell* factors weigh in favor of final approval.

### e. The Ability of Defendants to Withstand a Greater Judgment (*Grinnell* Factor 7)

A court also may consider a defendant's ability to withstand a judgment greater than that secured by settlement, although it is not generally one of the determining factors.  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2004) (affirming district court's finding that defendant's ability to pay more was irrelevant to assessment of settlement).  While the *inability* of a defendant to withstand greater judgment may weigh in favor of approval of a settlement, the *ability* of a defendant to withstand greater judgment does not necessarily weigh against approval of the settlement.  Indeed, courts generally do

not find the ability of a defendant to withstand a greater judgment to be an impediment to settlement when the other factors favor the settlement, and the ability of defendants to pay more money does not render a settlement unreasonable.  *See D'Amato*, 236 F.3d at 86; *Morris v. Affinity Health Plan, Inc.,* 859 F. Supp. 611 (S.D.N.Y. 2012) ("[A] defendant's ability to withstand a greater judgment, standing alone, does not suggest that the settlement is unfair") (internal citations omitted); *see also Davis,* 827 F. Supp. 2d at 178 (assigning "relatively little weight" to this factor and instead focusing on "the judgment in light of plaintiffs' claims and the other factors that the Court has discussed").  Although Defendants do have the ability to withstand a judgment greater than $22 million, the total potential damages in this case were not much more than $22 million.  Accordingly, this factor, by itself, does not weigh against final approval of the proposed Settlement.

### f.    The Settlement Is Reasonable (*Grinnell* Factors 8 and 9)

The determination of whether a settlement amount is reasonable "does not involve the use of a mathematical equation yielding a particularized sum."  *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005) (internal quotation omitted).  Instead, *Grinnell* factors eight and nine require a court to analyze the "range of reasonableness" of the settlement fund in light of the case and in light of all the risks associated with litigation. *Grinnell*, 495 F.2d at 463.

The adequacy of the amount offered in settlement must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case."  *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987).  The Court need only determine whether the Settlement falls within a "range of reasonableness" — a range that "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion."  *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972); *see also In re Global Crossing*, 225 F.R.D. at 461 (noting that "the certainty of [a] settlement amount has to be judged in [the] context of the legal and

practical obstacles to obtaining a large recovery"); *In re Indep. Energy Holdings PLC Sec. Litig.*, No. 00-cv-6689-SAS, 2003 WL 22244676, at *4 (S.D.N.Y. Sept. 29, 2003) (noting few cases tried before a jury result in full amount of damages claimed).   In considering the reasonableness of the proposed Settlement, the Court should consider that the Settlement provides for payment to the Class now, rather than a speculative payment many years down the road.  *In re AOL Time Warner Inc.*, No. 02-cv-5575-SWK, 2006 WL 903236, at *13 (S.D.N.Y. Apr. 6, 2006) ("[T]he benefit of the Settlement will . . . be realized far earlier than a hypothetical post-trial recovery").

The proposed Settlement here represents an excellent result under the circumstances, considering that a possible recovery at trial is zero.  If Plaintiffs were to certify a class and prevail on the merits, and the trier of fact accepts Plaintiffs' damage theories, the Class would recover approximately $27.1 million in overdraft fees assessed for Uber charges.  The proposed Settlement thus recoups over 80% of the potential damages.  The Settlement Class arguably may be entitled to prejudgment interest; however, even at an inflated prejudgment interest calculation, the Settlement's recovery is approximately 74% of the possible projected maximum.[8]  Such a large recovery realized immediately weighs heavily in favor of final approval.  *See In re Enron Corp. Sec. & ERISA Derivative Litig*, 228 F.R.D. 541, 566 (S.D. Tex. 2005) ("The settlement at this point would save great expense and would give the Plaintiffs hard cash, a bird in the hand.")

In fact, Courts routinely approve *far lower* rates of recovery in comparable cases. *See, e.g.*, *Bodnar v. Bank of Am.*, No. 5:14-cv-3224-EGS (E.D. Pa.) Dkt. 90 (July 5, 2016) (finally approving settlement in a matter involving overdrafts charged by Bank of America, and finding $27.5 million cash fund, which represented between 13% and 48% of the maximum amount of damages a "significant achievement"); *Farrell v. Bank of Am.*, No. 3:16-cv-492-L-WVG (S.D. Cal.), Dkt. 104-1 at 15 (June 30, 2018) (preliminarily approving

---

[8]      Class Counsel determined that the Settlement Class was arguably owed at most $2.45 million in pre-judgment interest.  (Ahdoot Prelim. Decl. ¶16.)

settlement that will provide approximately 9% of the most probable recoverable damages at trial; final approval not yet granted); *Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 198 (D.D.C. 2011) (finally approving class action settlement in overdraft fee litigation, noting that a recovery range of approximately 12% to 30% "seems to be within the realm of reasonableness"); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 583 (N.D. Ill. 2011) (finally approving class action settlement in a matter involving overdraft fees charged by Fifth Third Bank, finding "$9.5 million settlement fund still represents approximately 10% of the $96.5 million that is the class's maximum potential recovery"); *Mosser v. TD Bank, N.A. (In re Checking Account Overdraft Litig., MDL No. 2036)*, No. 09-md-2036-JLK, 2013 U.S. Dist. LEXIS 187627, at \*82 (S.D. Fla. Mar. 18, 2013) (approving settlement fund representing approximately 42% of the most probably aggregate damages that could have been recovered at trial); *Torres v. Bank of Am. (In re Checking Account)*, 803 F. Supp. 2d 1330, 1350 (S.D. Fla. 2011) (finally approved settlement in class action concerning overdraft fees charged by defendant bank where recovery of $410 million represented between 45 percent and 9 percent of anticipated recovery).[9]   Accordingly, the final two *Grinnell* factors also weigh in favor of final approval.

**B.     Notice to the Settlement Class Satisfied All the Requirements of Rule 23 and Due Process**

Notice to the Settlement Class of the proposed Settlement satisfied Rule 23(c)(2)(B),

---

[9]     Lower recovery percentages also have been approved in securities law settlements and other cases.  *See e.g. City of Providence v. Aeropostale, Inc.*, No. 11-cv-7132, 2014 WL 1883494, at \*9 (S.D.N.Y. May 9, 2014) (approving $15 million settlement that represented "a recovery in the range of approximately 9.2% to 21% of estimated damages"), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015); *In re Giant Interactive*, 279 F.R.D. at 163 ("the average settlement in securities class actions ranges from 3% to 7% of the class' total estimated losses"); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02-md-1484, 2007 WL 313474, at \*10 (S.D.N.Y. Jan. 31, 2007) (finding settlement representing recovery of approximately 6.25% of estimated damages to be "at the higher end of the range of reasonableness of recovery in class action securities litigations"); *In re Gilat Satellite Networks, Ltd.*, No. 02-cv-1510, 2007 WL 2743675, at \*12 (E.D.N.Y. Sept. 18, 2007) (approving settlement representing 10% of maximum damages); *see also Grinnell*, 495 F.2d at 455 n.2 ("In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.").

which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173–75 (1974). The Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable" — *i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart*, 396 F.3d at 114. Both the Notice's substance and the method of its dissemination to potential Settlement Class Members satisfied these standards. The Notice contains the information required by Rule 23(c)(2)(B), including: (i) an explanation of the nature of the Action and the claims asserted; (ii) the definition of the Settlement Class; (iii) a description of the basic terms of the Settlement, including the amount of the consideration and the releases to be given; (iv) how the Net Settlement Fund would be distributed; (v) an explanation of the reasons why the Parties are proposing the Settlement; (vi) a statement indicating the attorneys' fees and expenses that will be sought; (vii) a description of Settlement Class Members' right to request exclusion from the Settlement Class or to object to the Settlement, or the requested attorneys' fees or expenses; and (viii) notice of the binding effect of a judgment on Settlement Class Members.

As explained above, the Notice Plan was fully and successfully carried out in accordance with the Preliminary Approval Order. This was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 182–83 (S.D.N.Y. 2014); *see also* Azari Decl. ¶¶29-32.

## C.     Final Certification of the Settlement Class

The Court's Preliminary Approval Order preliminarily certified the Settlement Class for Settlement purposes under Rules 23(a) and (b)(3). (Dkt. 71.) Nothing has changed since then to alter the propriety of class certification for Settlement purposes and, for all the reasons stated in Plaintiffs' Preliminary Approval Brief (Dkt. 64),

and in the Court's Preliminary Approval Order, Plaintiffs respectfully request that the Court grant final certification of the Settlement Class under Rules 23(a) and (b)(3).

### V.    CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court finally approve the Settlement and enter the Final Approval Order and Judgment proposed by the Parties and concurrently submitted as Exhibits to the Notice of this Motion.

Dated: July 6, 2018                                    Respectfully submitted,

AHDOOT & WOLFSON, PC


Robert R. Ahdoot
Tina Wolfson
45 Main Street, Suite 230
Brooklyn, New York 11201
Tel:    917-336-0171
Fax:    917-336-0177
*rahdoot@ahdootwolfson.com*
*twolfson@ahdootwolfson.com*

AHDOOT & WOLFSON, PC
Tina Wolfson
Robert R. Ahdoot
Theodore W. Maya
Vanessa Shakib
10728 Lindbrook Drive
Los Angeles, California 90024
Tel:    310-474-9111
Fax:    310-474-8585
*rahdoot@ahdootwolfson.com*
*tmaya@ahdootwolfson.com*
*bking@ahdootwolfson.com*
*vshakib@ahdootwolfson.com*

Attorneys for Plaintiffs and proposed
Class Counsel

## CERTIFICATE OF SERVICE

I, Robert R. Ahdoot, hereby certify that a copy of the foregoing document, filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies shall be served by first class mail postage prepaid on all counsel who are not served through the CM/ECF system on July 6, 2018.

_____
Robert R. Ahdoot

26